UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE CENTER FOR BEHAVIORAL HEALTH - RHODE ISLAND, INC.<br><br>Plaintiff | ) | |
| v. | ) | C.A. No. 01-179-L |
| THE WESTERLY ZONING BOARD OF REVIEW by and through its Members, JANE HENCE, HARRISON DAY, ALBERT B. OUIMET, GIORGIO S. GENCARELLI, JOHN GENTILE, JR., DAVID GINGERELLA, FRANK T. VERZILLO and ROBERT M. DRISCOLL; ANTHONY R. GIORDANO, in his capacity as Westerly Zoning Official; and GERI ANN PETRANGELO, the Finance Director of the Town of Westerly<br><br>Defendants | ) | |

DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge

This case is before the Court on cross motions for summary judgment. The dispute arises from an alleged violation of Title II of the Americans with Disabilities Act (hereinafter "ADA"). Plaintiff is The Center for Behavioral Health - Rhode Island, Inc. (hereinafter "CBH"), a methadone clinic in the Town of Westerly, Rhode Island. CBH claims that it was subjected to discrimination, because of the service it provides and its association with methadone users, when it was served with a Cease

and Desist Order (hereinafter "the Order") by Anthony Giordano, the Westerly Zoning Official (hereinafter "Giordano"). CBH also claims that the Westerly Zoning Board of Review (hereinafter "ZBR") fostered that discrimination when it upheld the Order. Defendants have responded by denying that they discriminated against CBH, and also have asserted nine affirmative defenses.[1] CBH seeks a declaration from this Court that the actions of Defendants violate the ADA, and prays for an award of compensatory and punitive damages, costs and reasonable attorneys' fees.

For the reasons set forth below, this Court grants Defendants' motion for summary judgment on the ground that Plaintiff lacks standing to bring this suit. Thus, the Court also denies Plaintiff's motion for summary judgment.

FACTS AND TRAVEL

[1]Defendants list as their affirmative defenses: (1) "The plaintiff lacks standing," (2) "The immunity and/or qualified immunity provided by law protects the Defendants from suit," (3) "Zoning decisions of a municipality are not properly the subject of the Americans with Disabilities Act," (4) "The Defendants specifically deny discriminatory intent, motive or conduct," (5) "The Plaintiff failed to exhaust administrative remedies, barring its right to seek recovery in this litigation," (6) "All of the relief to which the Plaintiff would be entitled, if successful, has been obtained, requiring dismissal," (7) "This Court lacks jurisdiction over the subject matter of the lawsuit and therefore should abstain from a determination of the matter," (8) "The Defendants specifically rely upon the rules, regulations and ordinances of the Town of Westerly as they concern zoning rights and procedures, in their defense," and (9) "The Defendants rely upon the doctrine of res judicata in their defense, and as a complete bar to the claims of the plaintiff." See Am. Answer at 3-4.

In June 1999, Plaintiff, in order to open a methadone clinic, entered into a lease agreement with Rory H. and Jacqueline Oefinger (hereinafter "Oefingers"), the owners of the property located at 86 Beach Street, Westerly, Rhode Island (hereinafter "the Property"). The Property is located in a P-15 zone, which is a commercial zone intended for Professional/Office use. The Westerly Zoning Ordinance states that a Professional/Office Zone "is intended to establish areas within which the town encourages a concentration of professional office and related uses." Westerly, R.I., Zoning Ordinance § 3.4(B)(1) (1998). A Professional Office is defined as "a building or portion of a building wherein services are performed involving predominantly administrative, professional or clerical operations." Id. at § 2.1. Additionally, the standard use tables indicate that "General and Professional Offices (including Medical, Legal, Accounting, engineering, architectural, insurance & real estate)" are permitted by right in a P-15 zone. Id. at § 4.2(G)(1.3). Abutters to the Property that were allowed to do business in that zone without a special use permit include a dentist, acupuncturist, radiologists, as well as oral and maxiofacial surgeons.

On November 4, 1999, subsequent to receiving a license from the Rhode Island Department of Mental Health, Retardation and Hospitals (hereinafter "MHRH") to operate a narcotic treatment facility, CBH opened a methadone clinic on the Property. Section

1.27 of the MHRH Rules and Regulations for the Licensing of Substance Abuse Facilities defines a narcotic treatment facility as "an organization that administers or dispenses a narcotic drug to a narcotic addict for maintenance or detoxification treatment, provides, when appropriate or necessary, a comprehensive range of medical and rehabilitative services."

On Friday, November 12, 1999, Giordano issued the Order addressed to the Oefingers. CBH also received a copy of the Order. The Order stated that a substance abuse facility was not allowed by right in a P-15 zone, but could be allowed upon application for a special use permit. The Order mandated the cessation of the clinic's operations until an application for a special use permit was submitted to and approved by the Westerly Zoning Board.

In response to the Order, CBH filed an action in Rhode Island Superior Court for injunctive and declaratory relief on Monday, November 15, 1999. CBH did not assert a claim under the ADA or seek damages. CBH was represented by Attorney Elizabeth Noonan, of Adler, Pollock & Sheehan, P.C. That same day, CBH was granted a temporary restraining order allowing it to continue operation of the clinic. The temporary restraining order, by its terms, was to remain effective until December 10, 1999. On that date, the Oefingers appealed the issuance of the Order to the ZBR, retaining Attorney Noonan for the appeal. Pursuant to the Westerly Zoning Ordinance, the Order was stayed pending the

outcome of the appeal. The Oefingers' appeal was based primarily on the claim that a methadone treatment center is a professional, medical office and therefore permitted by right in a P-15 zone.

Hearings were held by the ZBR on January 5, 2000 and on March 1, 2000. During the hearings, Giordano acknowledged that CBH provided some medical services on its premises. However, Giordano also indicated that he believed those medical services were incidental to what he viewed as being CBH's primary function, the dispensation of methadone. This, he stated, likened CBH to a pharmacy, which is not a permitted use in a P-15 zone. Giordano argued that the general public could not walk into CBH and obtain general medical services as they could at a general medical office.

During the hearings, Giordano also acknowledged that there was no definition of "medical office" in the Westerly Zoning Ordinance or the state enabling legislation. Additionally, Giordano also noted that prior to making his determination that CBH was not a medical office, he never contacted or visited CBH in order to determine the nature of the services that were provided. In fact, Giordano acknowledged that he had no experience dealing with methadone clinics, and that during his thirteen years as a zoning official in Westerly, he never had occasion to review zoning for methadone clinics. Giordano further stated that in his view, "a medical office provides a variety of medical services to a variety of patients." When pressed,

however, Giordano also acknowledged that there were dentists, podiatrists, and obstetricians/gynecologists in the P-15 zone and that each of these "medical offices" provided specific types of services to only a portion of the population.

On March 1, 2000, the ZBR voted four-to-one to uphold the Order. Of the four members who voted to uphold the Order, two indicated that they believed that the primary purpose of CBH was to dispense methadone, which made it analogous to a pharmacy, rather than a medical office. The decision took effect on April 6, 2000.

In a separate action that same day, the Oefingers appealed the ZBR'S decision to Rhode Island Superior Court in Washington County. The Oefingers argued that due to the nature of the services provided by CBH, it was indeed a medical office which is permitted by right in a P-15 zone. Additionally, the Oefingers argued that the ZBR's decision violated the ADA. Without delay, the Oefingers received a temporary restraining order, allowing CBH to remain open during the appeal process, and on November 15, 2000 the Superior Court issued a decision reversing the ZBR's decision and vacating the Order. The Court held that CBH is a professional medical office, and as such it was permitted to operate by right in a P-15 zone. The Court did not address the ADA claim.

CBH now requests that this Court declare that Defendants' Order and the subsequent ZBR decision result in a violation of

the ADA and award monetary damages.

## JURISDICTION

This case arises under Title II, Part A, of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 (2000). Therefore, this Court has original federal question jurisdiction over the matter pursuant to U.S. Const. art. III, § 2, cl. 1, which states that "[t]he judicial Power shall extend to all Cases ... arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority," and 28 U.S.C. § 1331, which states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## STANDARD OF REVIEW

A court is empowered to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). A genuine issue is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher

Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986)).

For a moving party to show that there is no genuine issue of material fact, it "must point out 'an absence of evidence supporting the nonmoving party's case.'" Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed.2d 265 (1986)). A party opposing a motion for summary judgment must do more than merely assert allegations in order to raise a genuine issue of material fact; "it must set forth specific facts demonstrating that there is a genuine issue for trial." Id.

When there are cross-motions for summary judgment, as is the situation in the present case, "the district court must resolve all genuine factual disputes in favor of the party opposing each such motion and draw all reasonable inferences derived from the facts in that party's favor." Doyle v. Huntress, Inc., 301 F. Supp. 2d 135, 141 (D.R.I. 2004) (quoting Atl. Fish Spotters Ass'n v. Evans, 321 F.3d 220, 223 (1st Cir. 2003)).

At the summary judgment stage, "there is 'no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood.'" Id. (quoting Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). "Therefore, when hearing a motion for summary judgment, it is the

responsibility of the trial judge to determine whether a reasonable trier of fact could find for the nonmoving party based on the admissible evidence, and to refrain from invading the province of the jury by weighing the evidence or making credibility determinations." Tanya Creations, Inc. v. Talbots, Inc., 356 F. Supp. 2d 97, 98 (D.R.I. 2005).

DISCUSSION

In its motion, Defendants argue that Plaintiff does not have standing to bring this suit and supports this claim with several different arguments. For the reasons stated herein, this Court concludes that Defendants are correct and that indeed CBH does not have standing to bring this suit.

As the First Circuit has held in the past, "[s]tanding is a 'threshold question in every federal case, determining the power of the court to entertain the suit.' After all, '[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." N.H. Right to Life PAC v. Gardner, 99 F.3d 8, 12 (1st Cir. 1996) (second alteration in original) (citations omitted).

The United States Supreme Court has said that "[i]t is axiomatic that '[t]he starting point in every case involving construction of a statute is the language itself.'" Landreth Timber Co. v. Landreth, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692 (1985) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S. Ct. 1917, 1935, 44 L. Ed. 2d 539

(1975) (Powell, J., concurring)) (second alteration in original). Therefore, to determine if the standing requirements under Title II of the ADA are met, this Court must first examine the text of the statute. The relevant language of Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Additionally, the enforcement provision of Title II, 42 U.S.C. § 12133, states that "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." Finally, the phrase "qualified individual with a disability" is defined as "an individual with a disability who ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Defendants interpret this language to mean that only natural persons have standing to bring suit under Title II of the ADA. However, some courts have held that organizations such as Plaintiff have standing to sue on their own behalf under Title II of the ADA. See MX Group, Inc. v. City of Covington, 293 F.3d 326, 335 (6th Cir. 2002); Innovative Health Sys., Inc. v. City

of White Plains, 117 F.3d 37, 47 (2d Cir. 1997), rev'd on other grounds, 252 F.3d 163 (2d Cir. 2001); see also START, Inc. v. Baltimore County, Maryland, 295 F. Supp. 2d 569, 576 (D. Md. 2003) (recognizing that a methadone clinic had standing to pursue a claim under Title II of the ADA if it suffered discrimination due to its plans to treat individuals with disabilities). But see Discovery House, Inc. v. Consol. City of Indianapolis, 319 F.3d 277 (7th Cir. 2003) (refraining from agreeing or disagreeing with cases that have held that entities such as CBH can sue to enforce the rights of others under the ADA, and instead holding that a drug treatment facility may not sue for lost profits under the ADA or the Rehabilitation Act).

In Innovative Health Sys., Inc., the plaintiff (hereinafter "IHS"), an outpatient drug and alcohol rehabilitation treatment center, sought a building permit in an effort to relocate its building. 117 F.3d at 40. After more than a year of trying to obtain the permit, IHS's application for same was ultimately denied. Id. IHS, along with five of its clients, brought suit against the City of White Plains and others claiming that the decision to revoke IHS's permit was discriminatory. Id. at 42. The City defended itself by arguing inter alia, that IHS lacked standing to bring the suit under the ADA. Id.

Upon appeal, the Second Circuit held that IHS had standing under Title II of the ADA. Id. at 47. The panel indicated that "Title II's enforcement provision extends relief to 'any person

alleging discrimination on the basis of disability.'" Id. (quoting 42 U.S.C. § 12133). The Court went on to say that "the use of such broad language in the enforcement provisions of the statutes 'evinces a congressional intention to define standing to bring a private action under [section 504 of the Rehabilitation Act] [and Title II] as broadly as is permitted by Article III of the Constitution.'" Id. (second alteration in original) (quoting Innovative Health Sys., Inc. v. City of White Plains, 931 F. Supp. 222, 237 (S.D.N.Y. 1996), aff'd, 117 F.3d 37 (2d Cir. 1997)). See also Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y. City Transit Auth., 342 F. Supp. 2d 160, 165 (S.D.N.Y. 2004) (using the broad reading of the phrase "any individual" as applied by the Second Circuit in Innovative Health Sys., Inc.).

The defendants in Innovative Health Sys., Inc. also argued that Titles I and III of the ADA have provisions that expressly prohibit associational discrimination while Title II does not. In Title I, the word "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. 12112(b)(4) (emphasis added). Likewise, Title III states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodation, or other opportunities to an individual or entity because of the known disability of an individual with whom the

individual or entity is known to have a relationship or association." 42 U.S.C. 12182(b)(1)(E) (emphasis added). The defendants in Innovative Health Sys., Inc. argued that because similar language is not found in Title II, Congress intended to withhold standing based on associational discrimination under Title II. Innovative Health Sys., Inc., 117 F.3d at 47.

Upon an examination of the legislative history and regulations implementing Title II of the ADA, the Second Circuit determined that Title II only uses a general definition of discrimination rather then a list of specific examples as it did in other sections, and that Congress did not intend for discrimination by a public entity that is not spelled out in Title II to be excused. Id. The Court noted that "[t]he House Committee on Education and Labor indicated that Title II's prohibitions are to be 'identical to those set out in the applicable provisions of titles I and III of this legislation.'" Id. (quoting H.R. Rep. No. 101-485(II), at 84 (1990) reprinted in 1990 U.S.C.C.A.N. 303, 367). The House Report that the Second Circuit quoted from also states that "the construction of 'discrimination' set forth in section 102(b) and (c) and section 302(b) should be incorporated in the regulations implementing this title." H.R. Rep. No. 101-485(II), at 84 (1990) reprinted in 1990 U.S.C.C.A.N. 303, 367. Sections 102(b) and 302(b) are the associational discrimination provisions of Title I and Title III, respectively. The Second Circuit also asserted that "the House

Report on the ADA states that the prohibitions of discrimination on the basis of association from Titles I and III should be incorporated in the regulations implementing Title II." Innovative Health Sys., Inc., 117 F.3d at 47. The House Report referred to by the Second Circuit, which was from the House Committee on the Judiciary, specifically remarks that:

> Title II should be read to incorporate provisions of titles I and III .... Unlike the other titles of this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Thus, the purpose of this section is to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited. The Committee intends that the regulations under title II incorporate interpretations of the term discrimination set forth in titles I and III of the ADA ....

H.R. Rep. No. 101-485(III), at 51-52 (1990) reprinted in 1990 U.S.C.C.A.N. 445, 474-75. See also S. Rep. No. 101-116, at 44 (1989) (stating that the forms of discrimination prohibited by section 202 of the ADA are comparable to those in the applicable provisions of Titles I and III). "[T]he regulations implementing Title II provide: '[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.'" Innovative Health Sys., Inc., 117 F.3d at 47 (quoting 28 C.F.R. § 35.130(g) (2004)). The Second Circuit stated that, despite the inconsistency between the language of Title II of the ADA and the legislative history and

federal regulations, "[i]n light of the specific congressional mandate to include this paragraph in the regulations ... and the fact that this particular construction of discrimination is not 'manifestly contrary' to Title II's general discrimination prohibition, we give the regulation the weight to which it is due." Innovative Health Sys., Inc., 117 F.3d at 48.

In MX Group, Inc. v. City of Covington, the plaintiff (hereinafter "MXG"), sought to open a new methadone clinic. 293 F.3d at 328. After having one zoning permit for a potential location revoked by the Covington Board of Adjustment (hereinafter "CBA"), MXG sought a second permit for another potential location, but was informed that a methadone clinic was not permitted in any zone in the city. Id. at 330. MXG brought suit against the City of Covington, claiming, inter alia, violation of the ADA, Id. at 328. No named patients were joined as plaintiffs, Id. at 335, and because of this defendants argued that MXG did not have standing under Title II of the ADA, Id. at 331.

Upon appeal, the Sixth Circuit adopted the Second Circuit's reasoning with regard to whether an entity such as a methadone clinic can sue under Title II of the ADA. 293 F.3d at 335. The Sixth Circuit noted that the Department of Justice was granted the authority to formulate regulations to implement Title II of the ADA and that it followed Congressional intent by doing so. Id., at 334. The Sixth Circuit also indicated that "the appendix

to [28 C.F.R. § 35.130] explain[s] that 'the individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability.'" Id. (quoting 28 C.F.R. 35.130, app. A at 544). Additionally, the Sixth Circuit noted that:

> The rule is therefore intended to encompass "entities that provide services to or are otherwise associated with" individuals with disabilities. "The provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association" with them.

Id. at 335 (quoting 28 C.F.R. 35.130, app. A at 544) (citations omitted).

The defendants in that case argued that because MXG failed to name patients among the plaintiffs, it still lacked standing to bring the suit because as the United States Supreme Court held, an individualized inquiry is necessary in order to determine whether or not an individual is disabled. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483, 119 S. Ct. 2139, 2147, 144 L. Ed. 2d 450 (1999). Without a patient as a plaintiff, defendants argued that an individualized inquiry is not possible, and therefore MGX did not have standing.

However, the Sixth Circuit held that despite the fact that there were no named patients as plaintiffs,

> [T]o overturn the district court's disposition ... on the basis that an individualized inquiry of a client is needed would defy reason as Plaintiff has presented evidence that it was altogether foreclosed from opening its clinic in the first place because of the substance abuse services it planned to offer to its potential clients and that Defendants discriminated against it on that basis.

MX Group, Inc., 293 F.3d at 336.

Given the logic of those decisions, this Court concludes that the interpretation of Title II of the ADA set forth by the Second and Sixth Circuits proves out to be persuasive. However, Defendants, also citing Sutton, 527 U.S. 471, argue that CBH's clients are not individuals with disabilities and that there must be an individualized inquiry into the status of its potential clients to determine whether or not they are disabled individuals. Defendants, relying on Discovery House, Inc., 319 F.3d 277, also claim that CBH does not have standing because it is seeking damages on its own behalf rather than injunctive relief, and that an entity, like CBH, cannot seek benefits that inure only to its benefit under Title II of the ADA. Accordingly, Defendants claim that CBH still lacks standing to bring this suit.

However, pursuant to Innovative Health Sys., Inc., 117 F.3d at 47, before this Court can address these arguments, it must determine whether or not CBH has met the basic standing requirements of Article III of the United States Constitution.

It has been held that "[t]he presence of a disagreement,

however sharp and acrimonious it may be, is insufficient by itself to meet [Article] III's requirements." N.H. Right to Life PAC V. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (quoting Diamond v. Charles, 476 U.S. 54, 62, 106 S. Ct. 1697, 1703, 90 L. Ed. 2d 48 (1986)). Article III requires that the party invoking a federal court's jurisdiction "establish that (1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." United States v. Moneta Capital Corp., Nos. 04-1950, 04-1951, 2005 U.S. App. LEXIS 12902, at *7-8 (1st Cir. June 29, 2005) (emphasis added) (quoting N.H. Right to Life PAC, 99 F.3d at 13). See also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 472, 102 S. Ct. 752, 758, 70 L. Ed. 2d 700 (1982); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992); Tandy v. City of Wichita, 380 F.3d 1277, 1283 (10th Cir. 2004). Furthermore, "[s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." Lujan, 504 U.S. at 561. Therefore, "[i]n response to a summary judgment motion ... the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' ... which for

purposes of the summary judgment motion will be taken to be true." Id.

In the present case, this Court concludes that given the evidence here, CBH cannot satisfy the first prong of the test for standing under Article III of the United States Constitution. Indeed, CBH has not established that it has suffered an actual injury in the past or is threatened with injury in the future. The evidence indicates that CBH opened its facilities on November 4, 1999 and received the Order on Friday, November 12, 1999. On the following Monday, November 15, 1999, CBH sought and received a temporary restraining order allowing it to continue operation. CBH has never alleged or submitted any evidence showing that it was forced to close its clinic at any time as a result of the Order. In fact, there is no allegation or supporting evidence that indicates that CBH was *ever* prevented from running its methadone clinic. Additionally, there is no allegation or evidence indicating that CBH lost profits, clients, or was otherwise adversely affected as a result of Defendants' actions.

The only allegation that CBH has made is a very general statement that "[a]s a direct and proximate cause of the discriminatory actions of the Zoning Official and the Board, CBH has suffered damages." (Pl.'s Compl. ¶ 20.) The only other possible evidence that could indicate that CBH suffered an injury comes from Defendants, not CBH. In Exhibit A of the Memorandum of Defendants in Reply to the Plaintiff's Objection to Defendants'

Motion to Amend is a copy of the decision from the Oefingers' state court case which stated "[t]he Board upheld the Cease and Desist Order issued by the zoning official, denying Plaintiffs (appellants) and their lessee the right to operate a methadone treatment facility on the subject property." Oefinger v. Zoning Bd. of Review of Town of Westerly, No. C.A. 00-0159, 2000 WL 1725485, at *1 (R.I. Super. Ct. Nov. 15 2000). However, as highlighted above, there has been no evidence submitted to this Court that supports that statement. Additionally, the case at bar is not an appeal from the state court case - it is a separate action with different parties. This Court is not bound by any factual determinations made by the state court. See Lektro-Vend Corp. v. Vendo Corp., 500 F. Supp. 332, 348 (N.D. Ill. 1980), aff'd, 660 F.2d 255 (7th Cir. 1981); see also Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 334 (5th Cir. 2001).

Additional potential evidence to support CBH is also found in Exhibit B of the Memorandum of Defendants in Reply to the Plaintiff's Objection to Defendants' Motion to Amend. The verified complaint from CBH's action in state court seeking injunctive relief, which is part of that exhibit, states that "[o]n or about November 4, 1999 CBH began receiving and treating patients and currently provides daily treatment to approximately 20 patients." (Verified Compl. ¶ 7.) This suggests that at the time of the state court action, CBH was open for business on the weekends, including between Friday, November 12, 1999 and Monday,

November 15, 1999. While it seems like a reasonable assumption that CBH was forced to close its business as a result of the Order, there is evidence in the same exhibit that suggests otherwise.

As part of Exhibit B of the Memorandum of Defendants in Reply to the Plaintiff's Objection to Defendants' Motion to Amend, Defendants attached a copy of CBH's memorandum of law supporting its motion for a preliminary injunction in the earlier state court action. Several passages in that memorandum suggest that CBH was not forced to close as a result of the Order. One such passage reads "[i]f this treatment is interrupted, CBH will be unable to treat its patients at the Westerly facility .... Those patients will be denied any type of treatment to the detriment of their health and mental well being." (Pl.'s Mem. Supp. Prelim. Inj. at 7.) Another passage states that "[i]f CBH cannot continue its treatment of patients, it will constitute inference [sic] with the doctor-patient relationship which will cause irreparable harm." (Id. at 8-9.) The memorandum further states:

> The injunction will protect the physician/patient relationship and the health of patients using CBH while the legal issues are resolved. Alternatively, failure to grant the injunction will significantly jeopardize the physician/patient relationship and put at risk the health of patients involved. The injunction will maintain the status quo and allow this Court to decide the matter without threat to any patent's health or mental well being .... Accordingly, the Town should have no rational objection to

> maintaining the status quo while the matter is resolved.

(Id. at 9.) Finally, the memorandum concludes by asserting that "[t]he injunction will protect the integrity of the physician/patient relationship in the State of Rhode Island and will protect the health of the patients of CBH. Alternatively, denial of the injunction would create a significant risk to the health of these patients ...." (Id.) All of these passages share a common theme: the state court should grant a preliminary injunction to prevent infliction of harm on CBH and its patients, not to redress inflicted harm. The fact that CBH argued to maintain the status quo by the granting of a preliminary injunction indicates clearly that CBH was still operating at that time.

While it is possible that one could reasonably assume that CBH was forced to close its business as a result of the Order at some point, it is also an equally reasonable assumption that CBH continued to operate and was never forced to close. Therefore, it would be pure speculation for this Court to make an assumption either way. However, one fact is strikingly clear: CBH has not alleged or offered evidence to this Court that it was forced to close its business as a result of the Order at any time after it commenced operation. As stated above, there is "no room for the judge to superimpose his own ideas of probability and likelihood" when deciding a motion for summary judgment. Doyle, 301 F. Supp.

2d at 141 (quoting Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). "The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." Valley Forge Christian Coll., 454 U.S. at 473. Had CBH proffered some evidence indicating that CBH had suffered an actual injury, this case would proceed to trial because there would be disputed issues of fact.

Therefore, despite apparent similarities, this case is distinguishable from both Innovative Health Sys., Inc. and MX Group, Inc. in that the plaintiffs in both of those cases alleged, and were able to prove, actual injuries. IHS was prevented from relocating its business, while MXG was prevented from opening its methadone clinic altogether. It bears repeating that there is no allegation or supporting evidence that CBH was ever interfered with or prevented from running its business.

Since CBH cannot meet the first prong of the test for standing under Article III of the United States Constitution, CBH does not have standing to bring this suit. As a result, this court, lacking jurisdiction, can go no further and may not evaluate Defendants' additional arguments regarding standing on the merits of the case, including the numerous affirmative defenses asserted by Defendants.

For the foregoing reasons, this Court grants summary judgment in favor of Defendants and denies Plaintiff's motion for brevis disposition.

The clerk shall enter judgment for all Defendants, forthwith.

It is so ordered.

Ronald R. Lagueux
Senior Judge
July 13, 2005